IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LARRY BRUGH AND SUZANNE** | ) | **Case No. 3:17-cv-71** |
| **BRUGH,** | ) | |
| **Plaintiffs,** | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MOUNT ALOYSIUS COLLEGE AND** | ) | |
| **THOMAS FOLEY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

### I.    Introduction

This case arises from the termination and alleged demotion of Plaintiff Larry Brugh

("Larry") and the termination of his wife, Plaintiff Suzanne Brugh ("Suzanne") (collectively,

the "Brughs"), allegedly in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")

and the Pennsylvania Human Relations Act (the "PHRA"), from and by Defendant Mount

Aloysius College (the "College") and the College's former President, Thomas Foley

("President Foley"). Presently before the Court is Defendants' Mount Aloysius College and

Thomas Foley's (collectively, "MAC") Motion for Summary Judgment (ECF No. 44). The

Motion is fully briefed (ECF Nos. 45, 46, 47, 56, 57, 58, 59, 60, 62, 63) and ripe for disposition.

For the reasons that follow, this Court **GRANTS IN PART** and **DENIES IN PART** MAC's

Motion.

### II.    Jurisdiction and Venue

The Court has jurisdiction over Plaintiffs' Title VII claim as it arises under federal

law. 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiffs' PHRA claim

because the claim forms part of the same case or controversy. 28 U.S.C. § 1367. Venue is proper because a substantial portion of the events giving rise to the claims occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391.

### III. Factual Background

The Court derives the following facts from MAC's Concise Statement of Material Facts[1] (ECF No. 46), the Brughs' Response in Opposition (ECF No. 56), the Brughs' Concise Statement of Disputed Material Facts (ECF No. 58), and MAC's Response (ECF No. 63). These facts are undisputed unless noted otherwise.

#### A. The Brughs Begin Working at The College and Larry Witnesses Alleged Racial Discrimination by The College

In 1985, Larry began working at the College as its Assistant Resident Director Intern. (ECF No. 46 ¶ 3.) Throughout the rest of the decade, Larry held the titles of Assistant Director of Career Services and Assistant Dean of Student Services. (*Id.* ¶¶ 7, 11, 12.) By 1997, Larry held the title of Director of Career Services. (*Id.* ¶ 31.) In 1988, Larry hired Suzanne (née Bryja) as the College's Assistant Director of Resident Life. (*Id.* ¶ 17.) Larry and Suzanne began dating within a few months and married on July 1, 1989. (*Id.* ¶¶ 17, 21, 23.)

---

[1] In response to the Brughs' Emergency Motion to Strike (ECF No. 49), the Court struck all but 110 of MAC's factual assertions contained in its Concise Statement of Material Facts (ECF No. 46). (*See* ECF No. 53 at 3 n.2.) The Court does not consider these stricken facts in deciding the pending Motion but does recount several facts that it struck from the record in order to provide a complete picture of the dispute at the heart of this case. All facts the Court relies on in deciding the case are facts still contained in the record. Additionally, it appears that some of the facts that MAC cites to in its brief are incorrectly cited, i.e., MAC cited the wrong paragraphs. (*See, e.g.*, ECF No. 45 at 6 (citing ECF No. 46 ¶ 208 while quoting material contained in ¶ 212).) Accordingly, the Court will use those facts as required to address MAC's arguments.

According to Larry, in 1992, he witnessed the College discriminate against a men's basketball coach candidate and objected to this discrimination. (ECF No. 58 ¶¶ 4, 5). The alleged discrimination apparently took the form of refusing to hire an African American man as a head men's basketball coach because his wife was Caucasian. (ECF No. 56 ¶ 186.) When the College allegedly retaliated against the Brughs for Larry's objection, the Brughs filed charges of employment discrimination with the Pennsylvania Human Relations Commission ("PHRC") against the College in 1997 and 1998. (Id. ¶ 6; ECF No. 46 ¶¶ 34, 40.) The first complaint charged that the College's then-President, Sister Mary Ann Dillon, refused to appoint Larry to the post of Acting Dean of Students in retaliation for being identified as a witness in a PHRC proceeding against the College.[2] (ECF No. 58 ¶ 6; ECF No. 46 ¶ 35.) The second complaint alleged that the College had given Larry a negative performance evaluation because of both his identification as a witness in the PHRC discrimination proceeding and because of his prior PHRC complaint. (Id. ¶ 41.) The Brughs and the College settled the charges in 2000. (ECF No. 58 ¶ 7.)

## B. Larry Gets Angry at Female Employees Working at the College

The College has records describing several incidents throughout the 1990s of altercations between Larry and various female employees of the College. (ECF No. 46 ¶¶ 302–09.) A report authored by Veil Griffith, the College's Comptroller, covers her relationship with Larry between 1989 and January of 1991: in one instance, Larry apparently became outraged after Griffith asked him about receipts; in another he entered

---

[2] While unclear, the Brughs imply that the PHRC complaint that identified Larry was filed in connection with the College's alleged racial discrimination.

her office without permission, became loud and offensive, and refused to leave. (*Id.* ¶ 302.) According to the report, on multiple occasions, Larry raised his voice to Griffith's secretary, Emily. (*Id.*)

On August 8, 1997, Joyce Neibauer, the College's Director of Student Activities, wrote a letter to Leonard Volk, Acting Dean of Student Affairs, and copied it to President Dillon (*Id.* ¶ 303.) The letter documented Ms. Neibauer's concerns about Larry's personality and temperament, stated that Larry told her that she "had better respect his position and authority," and noted that Larry was interfering with her ability to work. (*Id.* ¶ 304.) Ms. Neibauer wrote that Larry had harassed, threatened, and intimidated her, and that she had obtained a radio so that she could call security if she needed to safely retreat from him. (*Id.* ¶¶ 305–06.) Ms. Neibauer also expressed her belief that she was not the only employee of the College who was on the receiving end of Larry's temper. (*Id.* ¶ 307.)

In 1996, Larry disputed a performance evaluation that stated that his "unacceptable behavior" had hindered his effectiveness in his job; Larry sought removal of this portion of his evaluation. (*Id.* ¶ 228.) This behavior had occurred when the College asked him to perform duties that were outside the scope of his routine duties. (*Id.*) The evaluation also included a statement that "in the future, [Larry needed to learn] acceptable and professional ways of dealing with differing opinions from that of the [D]ean of [S]tudents." (*Id.*)

A few days after Larry disputed his review, he brought concerns about his relationship with his supervisor, Dr. Judy Newton, the Dean of Students, to the College in a letter to its then-President, Dr. Edward Pierce. (*Id.* ¶¶ 8, 46, 224, 230.) Larry complained of incidents between 1992 and 1996 where Dr. Newton was disrespectful of, and exhibited

4

unprofessional behavior towards, him and other male employees of the College. (*Id.* ¶ 231.) These incidents allegedly involved a failure to reprimand public displays of disrespect towards Larry by Dr. Newton's secretary and Dr. Newton's diminishment of his responsibilities. (*Id.* ¶ 232.) Larry also stated that he had considered filing a grievance against Dr. Newton but that he had refrained from doing so after the PHRC mentioned him as a possible witness in a matter in which Newton was involved. (*Id.* ¶ 230.) Ultimately, the College found that Larry's claims against Dr. Newton were unsubstantiated and did not discipline her. (*Id.* ¶¶ 242, 245.) The College also determined that no justification existed for removing the language that Larry objected to in his performance evaluation. (*Id.* ¶ 245.)

## C. The Brughs Move Out of Campus Housing

As part of her compensation, Suzanne received campus housing and Larry lived with her in campus housing for approximately thirteen years. (*Id.* ¶¶ 25, 30, 68, 69.) The Brughs left campus housing after Suzanne accepted the position of the College's Director of Student Involvement,[3] a job that did not come with campus housing as part of its compensation. (*Id.* ¶¶ 62, 65.) The Brughs were upset that the College no longer provided campus housing for them, and Larry went to President Dillon to complain in September of 2001. (*Id.* ¶¶ 31, 69, 75.) There is a dispute over how upset the Brughs were over the loss of their campus housing and how strongly Larry complained to President Dillon. (*See* ECF

---

[3] MAC labels this position as both Director of Student Involvement and Director of Student Development. (*Compare* ECF No. 46 ¶ 62, *with id.* ¶ 65.) There is no indication, however, that these are actually different positions; accordingly, the Court will refer to the position as Director of Student Involvement.

5

No. 46 ¶¶ 74–79; ECF No. 56 ¶¶ 74–79.) Following Larry's visit to President Dillon, she issued a written reprimand to Larry regarding his conduct. (ECF No. 46 ¶ 84.) Larry avers that he has no recollection of ever receiving the reprimand. (ECF No. 56 ¶ 84.) On October 1, 2001, Larry filed a grievance with the College, alleging that the reprimand was not warranted, and that the College should remove it from his file. (*Id.* ¶ 85; ECF No. 46 ¶ 85.) The parties ultimately resolved the grievance and the College allowed the Brughs to stay in campus housing while the Brughs built a permanent home and the College kept the reprimand in Larry's file until June of 2002. (ECF No. 46 ¶ 88.) In 2008, Suzanne left the College on good terms, having obtained a job at Pennsylvania Highlands Community College. (*Id.* ¶¶ 109–10.)

The Brughs filed no further formal employment grievances against the College until 2012. (*See* ECF No. 46.)

## D. Thomas Foley Becomes President of the College and the Brughs Again Report Employment Grievances to the College

On August 1, 2010, Thomas Foley became President of the College. (ECF No. 46 ¶¶ 127–28.) At that time, Larry was serving as Director of Career Services and as Assistant Dean of Student Affairs; Suzanne was no longer an employee of the College. (*Id.* ¶ 140.) In December of 2011, the Brughs invited Suzanne Campbell, the College's Senior Vice President for Administration, to lunch, so that Larry could inform Campbell about his grievances with the College. (*Id.* ¶¶ 137, 148.) At that lunch, the Brughs informed Campbell that the College had subjected them to a hostile work environment during the 1990s as a result of Larry's objections to discrimination and told Campbell about the harms that that

hostile environment had caused them. (*Id.* ¶ 150.) Larry also accused his current supervisor, Dr. Jane Grassadonia, of making disparaging statements about him.[4] (*Id.* ¶ 151.)

A few months later, Larry contacted Campbell again and reiterated his past concerns with the College. (*Id.* ¶¶ 153–54.) In April of 2012, Larry filed a formal complaint with Human Resources against Dr. Grassadonia, including various instances where he felt that Dr. Grassadonia had slighted or disrespected him, going as far back as 2006. (*Id.* ¶¶ 158, 163.) Larry alleged that Dr. Grassadonia was diminishing his job as "number two" in Student Affairs. (*Id.* ¶ 156.) Larry's allegations of disrespectful conduct by Dr. Grassadonia included: (1) redesigning the Student Affairs Department; (2) two occasions where Dr. Grassadonia gave Larry postings for jobs at other institutions; (3) a change in the process of conducting interviews; (4) the handling of a student suicide; and (5) the fact that Dr. Grassadonia changed Larry's previously weekly meetings with her to a biweekly basis without consulting him. (*Id.* ¶ 163.) Following Larry's filing of the complaint, the College's Director of Human Resources, Tonia Gordon, opened an investigation into his allegations. (*Id.* ¶ 163, 177.) After several months of investigation and attempted mediation, Gordon contacted President Foley and stated that the relationship between Larry and Dr. Grassadonia was fractured and that the mediation process was not working. (*Id.* ¶ 176.) In response, President Foley convened a committee of several top officials at the College: Campbell; Tim Fulop, Senior Vice President of Academic Affairs; Sister Helen Marie, Vice President for Mission Integration; and Gordon. (*Id.* ¶ 177.) President Foley requested that

---

[4] The Brughs do not elaborate on the timing and content of these allegedly disparaging statements

the committee review Larry's file and provide him with a recommendation on how to move forward in resolving the dispute. (*Id.*) The parties dispute whether President Foley had previously viewed the materials in Larry's file before asking the committee to review them. (*Id.* ¶ 180; ECF No. 56 ¶ 180.)

## E. The College Rearranges Larry's Reporting Structure, Then Ultimately Terminates His Employment

The committee met in July of 2012 and discussed three possible options: (1) reassigning Larry to another department to alleviate conflicts between him and Dr. Grassadonia; (2) redesigning Larry's job description to more accurately reflect his current responsibilities, though the committee worried that Larry might perceive an alteration to his title to be disrespectful; and (3) termination. (ECF No. 46 ¶ 187.) The parties dispute whether the committee settled on a recommendation and made that recommendation to President Foley. (*Id.* ¶¶ 187–89; ECF No. 56 ¶ 187–89.)

President Foley decided to reassign Larry to work for Fulop in Academic Affairs and remove Larry's title as Assistant Dean of Student Affairs. (ECF No. 46 ¶¶ 192–95.) President Foley met with Larry at the start of August and informed him that he would be reporting to Fulop and that he was no longer Assistant Dean of Student Affairs, but that he would remain Director of Career Services and that his salary would not change. (*Id.* ¶¶ 207, 209.) President Foley told Larry that he wanted Larry to focus his energies on students; Larry appeared to agree. (*Id.* ¶ 208.) On August 1, 2012, President Foley announced Larry's new position to the rest of the College. (*Id.* ¶ 212.) At some point after Larry began

8

reporting to Fulop, President Foley reviewed the file he had given to the committee, which contained records of Larry's past grievances with the College.[5] (*Id.* ¶ 214.)

On August 30, 2012, the Brughs' attorney, James Carroll,[6] sent a letter to Daniel Rullo, Chairperson of the College's Board of Trustees on behalf of Larry. (*Id.* ¶ 283.) In the letter, Attorney Carroll informed the College of his conclusion that Larry's reassignment constituted a demotion and that the College had unlawfully retaliated against Larry by demoting him.[7] (*Id.* ¶ 284.) One week later, on September 6, 2012, Chairperson Rullo responded to Attorney Carroll's letter and requested details about Larry's claims. (*Id.* ¶ 288.) The next day, President Foley held a mandatory meeting with the staff of the Student Affairs Department to discuss Larry's transition. (ECF No. 58 ¶¶ 11, 13.) President Foley informed staff that Larry had retained an attorney and would argue that the College had discriminated against him. (*Id.* ¶ 14.) President Foley also stated that when someone hires an attorney and claims discrimination, that raises the temperature of the dispute. (*Id.*) President Foley stated that Larry's claim of discrimination was false because the College had not demoted him and also noted that his would not be the first time that Larry had sued the College. (*Id.* ¶¶ 16–17.)

On September 21, 2012, Attorney Carroll sent a second letter to Chairperson Rullo, this one expressing his "overriding concern" that the College was retaliating against Larry

---

[5] The parties dispute whether President Foley had seen these files prior to reassigning Larry. (ECF No. 46 ¶ 180; ECF No. 56 ¶ 180.)

[6] Attorney Carroll remains counsel for the Brughs and represents them in this matter.

[7] Attorney Carroll's letter also indicated that gender discrimination was another basis for the demotion, but the Brughs do not elaborate on these allegations. (ECF No. 46 ¶ 284.)

as a result of his objections to racial discrimination in 1992.[8] (ECF No. 56 ¶ 292; ECF No. 59-1 at 41–44.) Chairperson Rullo forwarded this letter to President Foley. (ECF No. 46 ¶ 293.) After President Foley received the letter, he reviewed Larry's file which described Larry's employment history at the College, including the various grievances the Brughs had filed. (*Id.* ¶¶ 295, 298, 302–09.) At some point following President Foley's review of Larry's file, and the incidents it documented, he determined that the College should terminate Larry's employment; the parties dispute when this decision occurred. (*Id.* ¶ 328; ECF No. 58 ¶ 22; ECF No. 63 ¶ 22.) President Foley brought this decision to the College's Board for its opinion, though the parties dispute whether the Board approved President Foley's recommendation to terminate Larry. (ECF No. 46 ¶¶ 329–30; ECF No. 56 ¶¶ 329–30.) MAC maintains that the College did not decide to terminate Larry until December of 2012; the Brughs contend that the College made that decision on September 27, 2012, three days after Chairperson Rullo received Attorney Carroll's second letter. (ECF No. 63 ¶ 22; ECF No. 58 ¶ 22.)

On December 10, 2012, President Foley and Chairperson Rullo joined Fulop in a meeting with Larry, the purpose of which was his termination. (ECF No. 46 ¶¶ 338–39.) Upon informing Larry that the College was terminating his employment, President Foley offered Larry the option to resign in lieu of termination. (*Id.* ¶ 340.) The parties dispute what President Foley said during this meeting, but Larry maintains that President Foley told him that the College was terminating his employment because of Attorney Carroll's

---

[8] Attorney Carroll also reiterated Larry's concerns that the College was discriminating against him on the basis of gender. (ECF No. 56 ¶ 292; ECF No. 59-1 at 41–44.)

letters to the College on Larry's behalf. (ECF No. 58 ¶ 26; ECF No. 63 ¶ 26.) Fulop's testimony also supports this allegation. (ECF No. 58 ¶ 26.)

Prior to his termination, in his last four performance reviews, Larry received strong marks in the category of relationships, defined as "ability to get along with others [and] facilitate communication." (ECF No. 58 ¶¶ 2–3.) Larry began a new job at Pennsylvania Highlands Community College in March of 2013. (ECF No. 46 ¶ 344.)

### F. Suzanne Operates the Game Clocks at the College's Basketball Games

Although Suzanne departed the College in 2008, the College continued to utilize her services by hiring her to operate the game clocks for the College's basketball games. (ECF No. 46 ¶¶ 117–18.) The College paid game clock operators $25 per-game, and when necessary, issued the operators a Form 1099 for tax purposes.[9] (*Id.* ¶ 118.) Game clock operators worked on a per-game basis, and Suzanne signed a separate contract for each game she worked—she did not agree to operate the clock for every game, she had control over her schedule as to the games for which she would operate the clock, and she received no consequences if she was unable to operate the clock for a certain game. (*Id.* ¶¶ 119–22.) In 2011 and 2012, the College paid Suzanne a total of $800: $425 in 2011 and $375 in 2012, for operating the game clocks. (*Id.* ¶¶ 123–24.)

In 2010, President Foley attended a College basketball game, asked Ryan Smith, the College's Athletic Director, who was operating the game clocks, and questioned Smith

---

[9] Anyone who has paid more than $600 in one year for services rendered to someone who is not their employee must file a Form 1099 with the IRS. *See About Form 1099-MISC, Miscellaneous Income,* IRS, https://www.irs.gov/forms-pubs/about-form-1099-misc (last visited Dec. 18, 2019). This form is often given to independent contractors.

about why the College was not using its own employees to operate the clocks. (ECF No. 46 ¶¶ 352–53; ECF No. 58 ¶¶ 352–53.) The parties dispute whether President Foley then instructed Smith to replace the non-employee clock operators with College employees. (ECF No. 46 ¶ 352; ECF No. 566 ¶ 352.) MAC contends that President Foley directed Smith to replace the clock operators in 2010 and that Smith replied that he had no one with whom he could replace the operators; the Brughs maintain that President Foley directed the replacement of the clock operators in retaliation after Larry's termination. (ECF No. 46 ¶¶ 352–53; ECF No. 58 ¶¶ 352–53.) At some point during the 2012–13 basketball season, the College replaced Suzanne with a College employee, and Smith informed her that it was not his decision to replace her; neither the Brughs nor the College specified a date on which Suzanne's dismissal occurred. (ECF No. 46 ¶ 361; ECF No. 566 ¶ 361.) The College did not terminate Steve Shuniak, the second clock operator, [10] at the same time; the College maintains that it retained him until Shuniak could train another operator.[11] (ECF No. 46 ¶ 363.)

## IV. Procedural Background

The Brughs filed the Complaint on April 28, 2017 (ECF No. 1). After the case proceeded through discovery, MAC filed for summary judgment on July 1, 2019 (ECF No. 44.) In response to MAC's 68-page, 381-paragraph, Concise Statement of Material Facts (ECF No. 46), on July 11, 2019, the Brughs filed an Emergency Motion to Strike (ECF No. 49), requesting that this Court strike MAC's Motion for Summary Judgment and Concise

---

[10] Shuniak worked the game clocks on the same basis Suzanne did. (ECF No. 46 ¶ 357.)

[11] The parties do not state when Shuniak stopped operating the game clocks.

Statement of Material Facts. (ECF No. 49.) This Court granted the Motion in part, striking the statements contained in MAC's Concise Statement of Material Facts that MAC did not cite to in its brief in support of its Motion for Summary Judgment. (ECF No. 53.) The Brughs then responded to MAC's Motion for Summary Judgment on September 20, 2019, (ECF No. 57) to which MAC filed a Reply on October 18, 2019. (ECF No. 62.) The Brughs' Complaint includes two counts: (1) retaliation for Larry's opposition to racial discrimination in hiring and Attorney Carroll's letters to the college in 2012, including both Larry's termination and alleged demotion and Suzanne's termination, in violation of Title VII; and (2) those same acts of retaliation in violation of the PHRA. (ECF No. 1 ¶¶ 47–58.)

## V.    Legal Standard

This Court will grant summary judgment only "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact whenever "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a summary judgment

13

motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## VI.   Discussion

### A.  Title VII and PHRA Framework

This Court applies the same analysis to claims of retaliation under both Title VII and the PHRA. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 n.9 (3d Cir. 2016); *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083–84 (3d Cir. 1995); *Berezansky v. CNB Bank*, No. 3:17-cv-105, 2019 WL 4750326, at *5 (W.D. Pa. Sept. 30, 2019) (Gibson, J.). Accordingly,

14

if MAC is entitled to summary judgment on the Brughs' Title VII claim, it is likewise entitled to summary judgment on their PHRA claim.[12]

Title VII provides employees with protection from retaliatory actions taken by employers based on their reports of, or opposition to, unlawful employment practices or their support of charges of unlawful employment practices. 42 U.S.C. § 2000e-3(a). Specifically, §2000e-3 provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*Id.* In essence, Title VII bars employers from retaliating against workplace whistleblowers.

A plaintiff can defeat a defendant's summary judgment motion in a Title VII case in one of two ways: (1) showing direct evidence of retaliation (a "mixed-motives" case); (2) showing indirect evidence of retaliation (a "pretext" case). *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1095 n.4 (3d Cir. 1995). The Brughs argue that they have produced both direct and indirect evidence of retaliation. (ECF No. 57 at 10–12.) The Court addresses each argument in turn, beginning with direct evidence.

## B. The Court Denies MAC's Motion Because Larry Brugh Has Shown Direct Evidence of Retaliation with Respect to His Termination

### 1. The Parties' Arguments

MAC argues that the Brughs cannot produce sufficient direct evidence of retaliatory animus to defeat summary judgment. (ECF No. 62 at 5–6.) MAC asserts that the Brughs

---

[12] For the sake of convenience, the Court will refer only to the Brughs' Title VII claim in its analysis.

have misrepresented Fulop's testimony about the termination meeting in an effort to defeat MAC's summary judgment motion. (ECF No. 62 at 5.) MAC maintains that Fulop's testimony shows no evidence of retaliatory intent on President Foley's part, and actually shows that the only reason Foley terminated Larry was because Larry disparaged the College. (*Id.*) MAC also argues that, although Fulop stated in his deposition that he had recorded President Foley's retaliatory animus in his notes of the termination meeting, those notes do not contain any such record. (*Id.* at 5–6.) MAC also maintains that Larry's own declaration stating that President Foley had expressed a retaliatory motive is self-serving and that this Court cannot rely on it. (ECF No. 63 at 1.)

The Brughs respond that there is sufficient direct evidence of retaliatory motive to preclude summary judgment. (ECF No. 57 at 10.) The Brughs argue that at Larry's termination meeting, President Foley expressed that one of the reasons for Larry's termination was the letters that Attorney Carroll sent to the College on his behalf. (*Id.*) The Brughs also assert that Fulop's deposition testimony corroborates Larry's recollection. (*Id.*)

## 2. The Brughs Have Presented Sufficient Direct Evidence of Retaliation for a Reasonable Factfinder to Conclude That the College Inappropriately Retaliated Against Larry by Firing Him

In a mixed-motives case, the plaintiff must produce direct evidence of discrimination or retaliation. *Id.* This direct evidence must permit the factfinder to find that the allegedly retaliatory actor negatively relied upon an inappropriate criterion in making the retaliatory decision. *See Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998). If the plaintiff produces the required direct evidence, the employer must then show that it would have made the same decision even without the unlawful bias. *Starceski*, 54 F.3d at 1095 n.4.

16

Essentially, if the plaintiff produces sufficient direct proof, the employer retains only an affirmative defense on the issue of causation. *Id.*

If a reasonable factfinder could conclude that the College decided to fire Larry in retaliation for engaging in protected conduct, such as sending the College a letter complaining of other retaliation,[13] the Court must deny summary judgment. *See Connors*, 160 F.3d at 976. Here, there is sufficient direct evidence for a factfinder to conclude that retaliatory animus motivated President Foley's decision to terminate Larry.

Fulop's testimony, upon which the parties place primary reliance, states that President Foley did terminate Larry, at least partially, as a result of Attorney Carroll's letters:

> Question: Do you recall President Foley saying that, in addition, I want to fire Larry because he had a lawyer send a letter to the [C]ollege, threatening a lawsuit?
> Answer: I don't recall ever hearing that until the actual meeting.
> Question: But you did hear that during the actual meeting?
> Answer: Yes. It's in my notes.

(ECF 47-6 at 9:16–23.) Title VII protects employees from retaliation when they oppose or make charges about an employer's unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a). Attorney Carroll's letters to the College stated that he had concluded that the College had retaliatorily demoted Larry in violation of Title VII and the PHRA, a charge of unlawful employment practices. (*See* ECF No. 58-1 at 38–44.) Termination for having an attorney make a charge on an employee's behalf is a violation of Title VII. *See* 42 U.S.C. § 2000e-3(a).

---

[13] MAC does not dispute that Attorney Carroll's letters to the College constitute protected conduct. (ECf No. 45 at 12–13.)

17

Fulop's testimony would permit a reasonable factfinder to conclude that the College terminated Larry in violation of Title VII, and accordingly the Court denies MAC's Motion to the extent that it seeks summary judgment on Larry's claims of retaliation with respect to his termination. MAC is entitled to show that it would have terminated Larry in the absence of any retaliatory intent, but it has made no such showing here. *See Starceski*, 54 F.3d at 1095 n.4. Further, a reasonable jury could choose to believe Fulop's testimony, rather than any evidence that MAC would introduce in an attempt to prove its affirmative defense. In addition, Larry's own recollection, that President Foley had stated that the College was terminating him because of Attorney Carroll's letters, if testified to and believed at trial, could permit a reasonable jury to find that President Foley had fired Larry in retaliation. (*See* ECF No. 58-1 at 5.) MAC argues that Larry's declaration is self-serving and that this Court cannot rely on it in ruling on its summary judgment Motion, implicitly invoking the "sham affidavit" doctrine. (*See, e.g.*, ECF No. 63 at 2 ("[The Brughs] rely upon a self-serving declaration of Plaintiff Larry Brugh whose credibility is in question because he made false statements in a previous declaration submitted in this matter.").) This argument is unavailing.

The "sham affidavit" doctrine holds that a party may not create a genuine dispute of material fact and defeat summary judgment simply by filing an affidavit of record disputing the affiant's own sworn testimony unless the affiant provides a plausible reason for the contradiction. *Baer v. Chase*, 392 F.3d 609, 623–24 (3d Cir. 2004). Here, MAC has not directed the Court to any portion of Larry's deposition testimony where he states that President Foley did not express a retaliatory motive for his termination, or that contradicts his declaration. As there is no contradiction, Larry's affidavit is also sufficient to create a

dispute of material fact and preclude summary judgment on this issue. As for MAC's objections as to Larry's credibility, that is an argument as to the weight of the evidence, an issue not resolved on summary judgment.

Larry claims that his reassignment to Fulop and the removal of his Assistant Dean title also constituted retaliation. However, Larry has produced no direct evidence of retaliation in connection with his reassignment, so the Court will proceed to consider the indirect evidence he has produced.

### C. The Court Grants MAC's Motion in Part Because Larry Has Shown Indirect Evidence of Retaliation in Connection with His Termination but Not in Connection with His Reassignment

Although the Court denies MAC's Motion to the extent it seeks summary judgment on Larry's retaliation claim in connection with his termination, because Larry has presented sufficient direct evidence of retaliation to defeat summary judgment, the Court will also address his claim in the context of pretext and *McDonnell Douglas* burden shifting.[14]

The *McDonnell Douglas* burden shifting framework governs pretext cases under Title VII. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006); *see McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). To defeat summary judgment, a plaintiff must first make out a *prima facie* case of retaliation. *Moore*, 461 F.3d at 342. This *prima facie* case has three elements that a plaintiff must show: (1) the plaintiff engaged in a protected activity; (2) the employer subjected him to an adverse employment action after or during the protected activity; and (3) there is a causal link between the protected activity and the adverse action. *Id.* at 340–41. If the plaintiff successfully establishes a *prima facie* case, the burden

---

[14] Additionally, as the Brughs produced no direct evidence of retaliation concerning Larry's reassignment, the Court must consider the indirect evidence of retaliation with respect to that claim.

then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* at 342. Finally, once an employer has articulated non-retaliatory reason, the employee reshoulders the burden and must produce sufficient evidence for a factfinder to determine that the proffered reason is pretextual and that the true grounds for the adverse employment action were retaliatory. *Id.*

### 1. The Parties' Arguments

MAC concedes that the Brughs have established the first element of a *prima facie* case, engaging in protected conduct. (ECF No. 45 at 12–13.) However, MAC denies that the College either subjected Larry to an adverse employment action or that there was any causal link between any adverse employment action and his engaging in protected conduct, and that, therefore, the Brughs cannot to establish a *prima facie* case. (*Id.*) MAC advances several reasons why this is so: (1) Larry's reassignment was not a materially adverse action (*Id.* at 14–17); (2) the Brughs have failed to show evidence of a causal connection between protected activity and Larry's reassignment (*Id.* at 17–19); (3) the Brughs have failed to show a causal connection between Larry's termination and any protected activity[15] (*Id.* at 19–25); and (4) MAC had legitimate, non-retaliatory reasons for both reassigning and terminating Larry. (ECF No. 62 at 1.)

### 2. Larry Has Failed to Show That His Reassignment Was a Materially Adverse Action

The antiretaliation provisions of Title VII bar employers from retaliating against employees, but they do not bar all acts of retaliation; Title VII bars only retaliation that

---

[15] In so arguing, MAC concedes that Larry's termination was an adverse action. (*Id.* at 19.)

produces injury or harm. *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 67 (2006). This requires the employee to show that a reasonable employee would have found the action materially adverse, meaning that it could dissuade a reasonable employee from opposing an unlawful employment practice. *Id.* at 68. This creates a separation between significant and trivial harms, and trivial harms, such as "petty slights or minor annoyances" do not give rise to a Title VII claim. *Id.; see Moore*, 461 F.3d at 346.

Generally, lateral transfers, changes of title, and changes of reporting relationships do not give rise to a Title VII claim. *Langley v. Merck & Co., Inc.*, 186 F. App'x 258, 260 (3d. Cir. 2006) (unpublished). However, if the reassignment is less desirable, even if the employee loses neither rank nor salary, the employee may have a Title VII claim. *Zelinski v. Pa. St. Police*, 108 F. App'x 700, 705–06 (3d Cir. 2004) (unpublished).

MAC argues that reassigning Larry was not a demotion and therefore not an adverse action under Title VII. (ECF No. 46 at 14.) MAC then contends that even if Larry's reassignment constitutes a demotion, it was not a materially adverse action required to trigger Title VII's protection because reassignment to an equivalent position is not materially adverse. (*Id.* at 14–16.)

The Brughs do not address MAC's argument that Larry's reassignment was not actually a demotion, apparently assuming that his change in title and duties constitutes a demotion and a materially adverse action for Title VII purposes. (*See* ECF No. 57 at 13–17 (addressing disputed material facts regarding Larry's reassignment).)

The Brughs have failed to produce evidence from which a reasonable jury could conclude that Larry's reassignment constituted a materially adverse action or that it was

21

adverse in any way. At the reassignment meeting, President Foley highlighted the importance of Larry's new focus on career services and, after the meeting, President Foley emphasized the importance of Larry's new position to the rest of the College. The Brughs have not shown, other than in conclusory statements, that the College demoted Larry or took an adverse action against him. (*See, e.g.,* ECF No. 58 ¶ 8 ("Thomas Foley met with Larry Brugh to inform him that he was being demoted").)

In *Burlington Northern*, the railroad reassigned the employee from operating a forklift to manual labor like clearing railway tracks of brush. *Burlington N.*, 548 U.S. at 57–58. The Supreme Court held that the plaintiff's evidence that the forklift operator position was more prestigious and considered a better job, along with the fact that the manual labor duties were considered to be "more arduous" was sufficient to permit a reasonable jury to infer that the reassignment was materially adverse. Here, the Brughs have produced no such evidence. Although the College removed Larry's title of Assistant Dean, the Brughs have not shown that his remaining position, Director of Career Services, was considered any less prestigious than his position as Assistant Dean, nor that it required work that was more arduous, nor that it was viewed as a lesser job.

The Brughs have not shown that Larry's reassignment rises above the level of "trivial" harms, or that the reassignment would have dissuaded a reasonable employee from opposing a forbidden employment practice. *See Burlington N.*, 543 U.S. at 67–68. Accordingly, the Brughs have failed to make out a *prima facie* case of retaliation in connection with Larry's reassignment.

22

**3. Larry Has Failed to Show That There Is a Causal Connection Between Protected Activity and His Reassignment but Has Shown That A Reasonable Jury Could Find a Causal Connection Between Protected Activity and His Termination**

Having determined that the Brughs have failed to show that Larry's reassignment was an adverse action, the Court need not address whether the Brughs have shown a causal connection between an adverse action and protected conduct. However, the Court will briefly do so in the interests of completeness. The Court will also address the Brughs' arguments that there is a causal connection between Larry's termination and his protected activity.[16]

MAC maintains that, even if Larry's reassignment was a materially adverse action, the Brughs have produced no evidence of a causal connection between protected activity in the 1990s and Larry's reassignment in 2012. (ECF No. 45 at 17.) MAC argues that the record demonstrates that President Foley was unaware of a history of complaints about Larry's behavior and his extensive grievance list until after his reassignment, and that therefore this protected activity could not have given rise retaliation because intent to retaliate is a precondition of any retaliation claim. (*Id.* at 17–18.) MAC also asserts that the temporal proximity between protected activity and reassignment is too remote to suggest a retaliatory motive. (*Id.* at 18–19.) MAC argues that the Brughs are intentionally misconstruing testimony in an attempt to create disputes of material facts.[17] (*Id.* at 4–7.)

---

[16] MAC does not dispute that Larry's termination is sufficient to establish the second element of the Brughs' *prima facie* case. (ECF No. 45 at 19.)

[17] The Court notes with disapproval the unnecessarily combative tone MAC takes towards the Brughs and their counsel. (*See* ECF No. 68 at 4 (accusing the Brughs of "egregious intentional misrepresentations of testimony . . . in an attempt to create disputed material facts").).

MAC next argues that the Brughs have produced no evidence to show that Larry's termination was causally connected to protected activity. (*Id.* at 19–20.) MAC maintains that the timing of Larry's termination, over two months after Attorney Carroll contacted the College on his behalf, is a time period that is long enough to require other evidence of retaliatory intent to defeat summary judgment. (*Id.* at 20.) MAC argues that no such evidence exists. (*Id.*)

In replying to MAC's arguments that there is no evidence of a causal connection between protected activity and Larry's reassignment and termination, the Brughs argue that there are three incidents that support their claim: (1) at the meeting where the College reassigned Larry, President Foley stated that "anyone who would call a lawyer doesn't deserve the courtesy of a meeting with the President" (ECF No. 57 at 14); at an August 23, 2012 meeting with Larry, President Foley stated that he "would welcome a lawsuit" from Larry (*Id.* at 14–15); and (3) during a meeting with the staff of the Student Affairs Department, President Foley stated, after telling the staff that Larry planned to sue the College, that hiring a lawyer "changes the temperature of things," evidencing retaliatory intent, along with an effort to discourage opposing unlawful employment practices, as well as negatively affecting Larry's work relationships within the department with his statements. (*Id.* at 15–17.)

For any retaliation claim to succeed, there must be evidence of an intent to retaliate. *Moore*, 461 F.3d at 341. The Brughs' claim of retaliation in connection with Larry's reassignment must rest upon events prior to Attorney Carroll's letters to the College, as Attorney Carroll sent the letters after Larry's reassignment. Accordingly, the events upon

24

which the Brughs' claims rest are those that Larry's personnel file documented over his career with the College, including alleged racial discrimination and proceedings stemming from that incident, as well as Larry's other disputes with the College's administration. MAC contends that President Foley, who made the decision to reassign Larry, did not look at Larry's file until after the reassignment occurred. (ECF No. 46 ¶ 180.) The Brughs deny this, but assert only that Fulop testified that President Foley never viewed the file. (ECF No. 58 ¶ 180.) However, this is not enough. The Brughs have produced no evidence that President Foley was aware of Larry's past history and the occurrences that form the foundation of the Brughs' claims. Accordingly, the Brughs have shown no evidence of an intent to retaliate in connection with Larry's reassignment and therefore no evidence of a causal connection.

MAC does not contest the first two elements of the Brughs' *prima facie* case concerning Larry's termination, that Larry engaged in protected conduct and that his termination was an adverse action. (*See* ECF No. 45 at 12–13, 19.) However, MAC argues that the Brughs have failed to establish the requisite causal connection between Larry's protected activity[18] and his termination. (*Id.* at 19–25.)

There are two ways to prove a casual connection: (1) where the time between the complaint and the alleged retaliation is so close as to be "unusually suggestive," timing alone can defeat summary judgment; and (2) "timing plus other evidence." *Williams v. Phila. Housing. Auth. Police Dep't.*, 380 F.3d 751, 760 (3d Cir. 2004), *superseded by statute on*

---

[18] MAC does not dispute that Attorney Carroll's letters to the College on Larry's behalf constitute protected activity. (ECF No. 45 at 12–13.)

*other grounds as recognized in, Lewis v. Univ. of Pa.,* 779 F. App'x 920 (3d Cir. 2019) (unpublished). The timing that is close enough to be "unusually suggestive" varies, but it is usually not more than a few days. *See, e.g., Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989) (holding that a termination two days after filing a claim of discrimination was sufficiently close in time to infer a causal connection).

Here, the Brughs have produced sufficient evidence of a causal connection under both timing theories. Under the "unusually suggestive" theory, the Brughs have produced evidence from which a reasonable jury could infer that the College decided to terminate Larry within a few days after Attorney Carroll's letter of September 24, 2012, to the College. (ECF No. 58 ¶ 22.) Chairperson Rullo's testimony, while not explicitly clear that President Foley had decided to terminate Larry, states that the College was moving "in th[e] direction" of firing Larry by September 27 or 28, 2012, and that the delay until December 10, 2012, was to prepare a severance agreement. (ECF No. 58-2 at 22:24–24:13.) This evidence, if the Brughs presented it at trial and the jury believed it, would permit the jury to infer a causal connection.

Additionally, even if the timing were not unusually suggestive, and the College did not make the decision to terminate Larry until later, the Brughs have produced sufficient other evidence to show a causal connection. Larry has sworn, under penalty of perjury, that, at his termination, President Foley stated that he was firing Larry because of Attorney Carroll's letters to the College. (ECF No. 58 ¶ 26; ECF No. 58-1 at 5.) Additionally, Fulop testified that President Foley made a statement to that effect at Larry's termination. (ECF No. 58-2 at 14.) This evidence would permit a reasonable jury to infer a causal connection.

## 4. The Brughs Have Failed to Show That The College's Reasons for Reassigning Larry Were Pretextual But Has Shown That A Reasonable Jury Could Find That The College's Reasons for Terminating Larry Were Pretextual

Once a plaintiff has made out a *prima facie* case of retaliation and the defendant has rebutted that case with a legitimate, nonretaliatory reason for the adverse employment action, the plaintiff must show that the legitimate reason proffered is merely a pretext, a sham or cover, for unlawful retaliation. *Moore*, 461 F.3d at 342.

MAC argues that, even if Larry has made out a prima facie case of retaliation, MAC has articulated legitimate, non-retaliatory reasons for reassigning and terminating him. (ECF No. 62 at 1–2.) MAC asserts that it reassigned Larry due to personality conflicts with his supervisor, Dr. Grassadonia. (*See* ECF No. 46 ¶¶ 156–76.) MAC argues that it terminated Larry because of his past history of complaints about his behavior, a nonretaliatory and legitimate reason. (*Id.* at 3.) MAC asserts that there is insufficient evidence for a reasonable jury to conclude that these proffered reasons are pretextual and that it is accordingly entitled to summary judgment. (*Id.* at 3–4.)

The Brughs do not specifically refute MAC's arguments that the College had legitimate, nonretaliatory reasons to terminate Larry,[19] though they do contend that MAC's proffered reasons are pretextual and state several examples of testimony and evidence they would introduce in support of that position. (ECF No. 57 at 12–13.)

MAC has advanced a legitimate, nonretaliatory reason for reassigning Larry: his poor relationship with his supervisor, Dr. Grassadonia, which resulted in unsuccessful

---

[19] This is likely due to the fact that MAC's initial brief in support of its Motion for Summary Judgment did not address the issue of pretext, but MAC raised the issue in its Reply.

mediation between the two parties and a damaged working relationship. (*See* ECF No. 46 ¶¶ 156–76.) The Brughs have produced no evidence that could convince a reasonable jury that this reason is pretextual. The Brughs' arguments on the issue of pretext address Larry's termination, rather than his reassignment, and they have therefore not shown that his reassignment was pretextual.

The Court will assume, for the sake of argument, that MAC's proffered reasons for terminating Larry are legitimate and nonretaliatory. However, President Foley's alleged statements at the termination meeting would permit a reasonable jury to conclude that those reasons are pretextual. Accordingly, the Court denies MAC's Motion for Summary Judgment with respect to Larry's termination.

### D. The Court Will Grant MAC's Motion Because Suzanne Brugh Was Not the College's Employee at the Time of Her Dismissal

The Court now turns to Suzanne's claims of retaliation.

#### 1. The Parties' Arguments

MAC contends that Suzanne has failed to establish a *prima facie* case of retaliation because, at the time the alleged acts of retaliation occurred, she was not an employee of the College. (ECF No. 45 at 25.) MAC also asserts that there was no retaliatory animus motivating President Foley's decision to replace the game clock operators; President Foley made the decision in 2010 so that college employees could have an opportunity to supplement their income and Ryan Smith, the athletic director, failed to follow that directive. (*Id.* at 25–26.)

MAC contends that Suzanne has failed to adduce any evidence of an adverse employment action or a causal connection between protected activity and an adverse employment action. (*Id.* at 26.) MAC asserts that her dismissal from game clock operation duties is a trivial harm that does not raise to the level of "adverse action" as Title VII defines that term because it is a "mere inconvenience." (*Id.*) With regard to a causal connection, MAC argues that, even assuming that her dismissal constituted an adverse action, there is no evidence that that dismissal is linked with retaliation. (*Id.*) MAC maintains that the evidence shows that the decision to replace the game clock operators had nothing to do with Larry, and that, absent an intent to retaliate, there can be no retaliation. (*Id.* at 26–27.)

The Brughs respond that there is sufficient evidence for Suzanne's claim to proceed. (ECF No. 57 at 17–18.) Smith testified that Foley had mentioned to him in August of 2012 about a potential lawsuit from the Brughs and that the motive for removing her from game clock operations was retaliatory. (*Id.*) The Brughs also argue that Steve Shuniak's continued operation of the game clocks shows retaliatory intent because only Suzanne was terminated. (*Id.* at 18–19.) The Brughs do not respond to MAC's arguments that Suzanne was not an employee that Title VII covers or that her dismissal was *de minimis*.

### 2. Suzanne Was Not an Employee of the College and Therefore Has No Claim for Retaliation

Title VII makes it unlawful for an employer to discriminate or retaliate against its employees. 42 U.S.C. § 2000e-3(a). Title VII defines an employee as "an individual employed by an employer." *Id.* § 2000e(f). An independent contractor is not an employee.[20]

---

[20] The PHRA does include certain independent contractors, but only those whose jobs the Pennsylvania Bureau of Professional and Occupational Affairs or the Fair Housing Act regulate.

29

*Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179 (3d Cir. 2009). The Third Circuit has construed this definition to incorporate traditional principles of agency law—whether the hiring party had the right to control the manner and means of performance—in determining employment status. *Id.* at 180. The relevant factors used in that determination are: (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional duties to the hired party; (6) the extent of the hired party's discretion over hours of work; (7) the method of payment; (8) the provision of employee benefits; and (9) the tax treatment of the hired party. *Id.* (citing *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992)).

Here, these factors, based on undisputed facts, indicate that Suzanne was an independent contractor and accordingly not subject to Title VII protection. Suzanne's tax treatment, filling out 1099 tax forms is the first major indicator of her independent contractor status. (ECF No. 46 ¶ 118.) In addition, the College had no right to mandate her operating the game clocks at any particular game—she operated the clocks on a per-game basis, controlled her own schedule, and could stop operating the game clocks at any time. (*Id.* ¶¶ 119–121.) While the fact that operating the game clocks required minimal skill, that the College provided the clocks, and that the work occurred on the College's premises point toward employee status, they are outweighed by the other factors. In addition, the College paid Suzanne on a per-game basis, not at a continuing rate, like a salary or hourly wage,

---

*Velocity Express v. Pa. Human Relations Comm'n*, 853 A.2d 1182, 1186 (Pa. Commw. Ct. 2004); *see Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179 n.1 (3d Cir. 2009). The Brughs have produced no evidence to show that that sphere includes Suzanne's operation of the game clocks.

and her work occurred only during basketball season—it did not continue throughout the year. (*Id.* ¶ 119.) Accordingly, Suzanne was an independent contractor and Title VII did not afford her protection. The Court accordingly grants MAC's Motion for summary judgment with respect to Suzanne's claim.

Additionally, the Brughs have shown no evidence of a causal connection under either the "unusually suggestive" or "timing plus other evidence" theories. The Brughs have not established when during the 2012-13 basketball season the College dismissed Suzanne, nor have they adduced other evidence to show create a genuine issue of material fact as to causation. Finally, the Brughs have failed to produce any evidence from which a reasonable jury could conclude that the College's dismissal of Suzanne was pretextual.

## VII.  Conclusion

MAC has shown that it is entitled to summary judgment on the Brughs' retaliation claim as it concerns Larry's alleged demotion but not as that claim relates to Larry's termination. MAC has also shown that it is entitled to judgment as a matter of law on Suzanne's claim because she was not an employee of the College at the time she was dismissed from game clock operation duties.

An appropriate order follows.

31

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LARRY BRUGH AND SUZANNE** | ) | **Case No. 3:17-cv-71** |
| **BRUGH,** | ) | |
| Plaintiffs, | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| v. | ) | |
| | ) | |
| **MOUNT ALOYSIUS COLLEGE AND** | ) | |
| **THOMAS FOLEY,** | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this 6th day of January, 2020, upon consideration of the Defendants'

Motion for Summary Judgment (ECF No. 44), and for the reasons set forth in the

accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Defendants'

Motion is **GRANTED IN PART** and **DENIED IN PART**. **IT IS FURTHER ORDERED**

**THAT**:

1. The Motion is **DENIED** to the extent that it seeks summary judgment on the

   Brughs' claim of retaliation concerning Larry's termination;

2. The Motion is **GRANTED** to the extent that it seeks summary judgment on the

   Brughs' claim of retaliation in connection with Larry's reassignment; and

3. The Motion is **GRANTED** to the extent that it seeks summary judgment on the

   Brughs' claim of retaliation in connection with Suzanne's dismissal.

BY THE COURT

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE